**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| ANGEL JOEL GUSMAN NEGRON, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>ASCENSION HEALTH, ASCENSION HEALTH ALLIANCE, ASCENSION HEALTH - IS INC. D/B/A ASCENSION TECHNOLOGIES,<br><br>Defendants. | Cause No: 4:24-cv-00669-JAR<br><br>**CLASS ACTION** |

**STIPULATED ESI PROTOCOL**

This Order Regarding Production of Documents Electronically Stored Information and Paper Documents ("ESI Protocol") shall govern the Parties in the above-captioned matter (the "Litigation").

Nothing in this ESI Protocol shall be construed to affect the authenticity or admissibility of information produced pursuant to this ESI Protocol. Compliance with this ESI Protocol does not constitute a waiver, by any Party, of any objection to the production of particular ESI as not relevant to any Party's claims or defenses or not proportional to the needs of the case (as defined in Fed. R. Civ. Proc. 26(b)(1)); nonresponsive, undiscoverable, or otherwise inadmissible; unduly burdensome or not reasonably accessible; or privileged. A Party's compliance with this ESI Protocol will not be interpreted to require disclosure of information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection.

IT IS HEREBY ORDERED:

**1. PURPOSE**

This Stipulated Protocol for Producing Documents and Electronically Stored Information ("ESI Protocol") shall govern the production of documents and ESI by Parties in the above captioned litigation (the "Action").

**2. APPLICABILITY**

The ESI Protocol shall apply to all documents and ESI that are produced in the first instance in this Action after the date of entry of this Order.

**3. SCOPE OF DISCOVERY**

The Parties agree to meet and confer in an attempt to reach agreement as it relates to search parameters designed to locate relevant non-privileged information, including but not limited to: data sources; date ranges; file types; custodians; and search terms. The Parties recognize that a variety of tools, methodologies, and/or processes exist to search, identify, cull, and collect potentially responsive documents and data for discovery in litigation. These include but are not limited to the use of search terms, technology-assisted review (TAR), artificial intelligence (AI), and other analytic tools. The Parties agree they will produce known responsive documents regardless of whether a Party utilizes search term filtering, TAR/active learning/generative AI process or other artificial intelligence as part of its search parameters or methodology.

(a) Search Terms:

If the Parties intend to use search terms to comply with their obligations under Rule 26 in responding to a request for production of documents, then the following provisions apply. The Producing Party will provide search terms in a proposed list that it believes may generate responsive material. The exchange of search terms will include the proposal of internal terminology or project names, where known and applicable. The Requesting Party may request

modifications and/or add additional search terms to the proposed list for consideration by the Producing Party. In the event that the Producing Party objects to the Requesting Party's modifications or additions based on burden grounds, the Producing Party will provide a hit report for those terms (including the number of unique documents that hit on each term and the total number of documents hitting on each term, as well as the total hits). Once the hit report has been produced, the Parties will meet and confer regarding the proposed terms in light of the hits obtained and other objections at issue. This process may be iterative. During this process, the Parties will work in good faith.

The Parties shall meet and confer and attempt to reach agreement on the Producing Party's custodial and non-custodial sources of information from which information will be collected for purposes of discovery.

## 4. DEFINITIONS

The Parties agree that the following definitions shall apply to the terms used herein. To the extent a technical term is not defined herein, the meaning of those technical terms shall be the same as set forth in the "The Sedona Conference Glossary: E-Discovery and Digital Information Management," Fifth Ed., February 2020.

(a) "Confidentiality Designation" means the legend affixed to "Confidential" or "Highly Confidential – Attorneys' Eyes Only" Discovery Material as defined by, and subject to, the terms of the future Stipulated Protective Order.

(b) "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Rule 34(a) of the Federal Rules of Civil Procedure.

(c) "Document Family" means a collection of pages or files produced manually or by a software application, constituting a logical single communication of information, but consisting of more than a single stand-alone record. Examples include a fax cover, the faxed letter, and an attachment to the letter, the fax cover being the "Parent," and the letter and attachment being a "Child."

(d) "Electronically Stored Information" or "ESI," as used herein has the same meaning as in Rule 34 of the Federal Rules of Civil Procedure.

(e) "Hash Value" is a unique numerical identifier that can be assigned to a file, a group of files, or a portion of a file, based on a standard mathematical algorithm applied to the characteristics of the data set.

(f) "Metadata" refers to application and system information of a file that contains data about the file, as opposed to describing the content of a file.

(g) "Native Format" means and refers to an electronic document's associated file structure defined by the original creating application. For example, the Native Format of an Excel workbook is a .xls or .xlsx file.

(h) "Optical Character Recognition" or "OCR" means the process of recognizing, and creating a file containing, visible text within an image.

(i) "Paper Records" or "Hard Copy Documents" means Documents existing in paper form at the time of collection.

(j) "Searchable Text" means the native text extracted from ESI and any Optical Character Recognition text ("OCR text") generated from a Hard-Copy Document or electronic image.

**5. PRODUCTION FORMAT**

The Parties agree that the documents and information produced in this Action will be produced in accordance with the following specifications:

(a) Paper Records: Paper Records will be scanned or otherwise converted into electronic form from paper documents in the following format specified in Appendix A.

(i) In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). The Parties will make their best efforts to have their vendors unitize documents correctly and will commit to address situations where there are improperly unitized documents.

(b) ESI:

The Parties agree, subject to the exceptions herein, that they will produce Electronically Stored Information ("ESI") in TIFF format according to the following specifications set forth in

Appendix A. In addition:

(i) TIFFs shall be produced as black & white, single-page TIFF images in accordance with the technical specifications set out in Appendix A, unless agreed to with the opposing Party or ordered by a court. Upon written request that identifies a reasonable number of individual documents at issue by Bates number, a Party shall produce color images for those documents. Documents produced in color shall be produced as single page, 300 DPI, color JPG images with the quality setting of 75% or higher with an .OPT (Opticon) image cross-reference file.

(ii) All TIFF files are to be provided with an accompanying searchable text (.TXT) file extracted from the native, electronic file (not generated as an OCR file from the TIFF image(s)), and such text files shall contain the full text extraction. To the extent reasonably feasible, extracted text shall provide all comments, tracked changes, speaker's notes, and text from hidden worksheets, slides, columns and rows. In the case of files with redacted text, OCR'ed text of the redacted documents may be provided in lieu of extracted text. OCR software should be set to the highest quality setting during processing. For documents in foreign languages, the OCR shall be performed using an OCR tool and settings suitable for the particular byte or multi-byte languages.

(iii) In the case of email, the corresponding text file shall include, where reasonably available (where not otherwise revealing of privileged information): (1) the individual(s) to whom the communication was directed ("To"); (2) the author(s) of the email communication ("From"); (3) who was copied and blind copied on such email ("CC" and "BCC"); (4) the subject line of the email ("RE" or "Subject"); (5) the names of any attachments; and (6) the text (body) of the email.

(c) Metadata Fields:

The metadata fields specified in Appendix A that are associated with each electronic document will be produced, to the extent they are available, and not otherwise revelatory of privileged information. No Party shall be required to manually populate any fields that do not exist as a document is maintained in the ordinary course of business.

(d) Time Zone:

To the extent reasonably practicable, ESI items shall be processed using a consistent time zone (e.g., GMT), and the time zone used shall be disclosed to the Requesting Party.

(e) Documents Produced in Native Format:

The Parties agree that they will produce the following types of ESI in their native file format:

(i) Excel spreadsheets;

(ii) Audio/video files; and

(iii) *Non-privileged* presentation files not needing any redactions.

Each native file will be named after its Bates number and shall have an accompanying Bates stamped single placeholder TIFF saying "PRODUCED IN NATIVE ONLY" that also indicates the confidentiality treatment of the record.

(f) Production of Redacted Presentation Files (e.g. PowerPoint/KeyNote and other presentation files).

The Parties agree that any relevant presentation file containing redactions will be produced as a color imaged document and not in its Native Format. The Parties agree that they will meet and confer as to any requests by a Party in receipt of imaged presentation files containing redactions seeking production of such files in native, and the burdens thereof.

(g) Redacted Files:

Extracted text will not be provided for electronic documents that have been redacted—e.g., for privilege or personal information—because the extracted text would reveal the redacted information. Instead, these files should be run through an OCR process to capture the visible text only and the results exchanged in lieu of the original extracted text. Documents that do not render in a readable format to TIFF, such as Excel spreadsheets, may be redacted in native form, so long as the Producing Party keeps a pristine, unredacted copy of the native file and identifies the natively redacted documents to the Receiving Party in the redaction field. Any redactions shall be clearly indicated on the face of the document and shall be indicated in the REDACTED field in the .dat load file with a "Yes" designation. Other than as permitted by this Order, an order

concerning confidentiality agreed to and/or entered in this Litigation, or consent of the Parties, no redactions for relevance may be made within a produced document or ESI item.

(h) De-duping and De-NISTing Documents:

Each Party will de-dupe ESI globally for exact duplicate documents (based on MD5 or SHA-1 hash values at the parent document level). This will result in the Producing Party producing only a single copy of responsive duplicate ESI, provided that all other custodians of the duplicate ESI are listed in the "Duplicate Custodians" (or similar name) field. The Parties shall de-duplicate stand-alone documents against stand-alone documents and shall de-duplicate top-level email documents against top-level email documents. Attachments should not be eliminated as duplicates for purposes of production, unless the parent email and all attachments are also duplicates. De-duplication shall not break apart families. Common system and program files as defined by the NIST library need not be processed, reviewed or produced.

(i) Most Inclusive Email Productions:

Email threads are email communications that contain prior or lesser-included email communications that also may exist separately in the Party's electronic files. A most inclusive email thread is one that contains all of the prior or lesser-included emails, including attachments, for that branch of the email thread. The Parties agree that removal of wholly included, prior-in-time, or lesser-included versions from potential production will reduce all Parties' costs of document review, production, and litigation-support hosting. Threading is therefore permitted, though not required.

For the avoidance of doubt, only email messages for which the parent document and all attachments are contained in the more inclusive email message will be considered less inclusive email messages that need not be produced. If the later in time message contains different text (such as where the later message adds in-line comments to the body of the earlier message) or does

not include an attachment that was part of the earlier message, the earlier message must be produced.

To the extent that an email thread contains privileged communications, such communications can be redacted. If an email thread contains both responsive, privileged communications and responsive, non-privileged communications, the entire email thread cannot be withheld as privileged.

(j) Parent-Child Relationships:

The Parties agree that parent-child relationships (the association between an attachment and its parent document) that have been maintained in the ordinary course of business should be preserved to the extent reasonably practicable. For example, if a Party is producing a hard copy printout of an email with its attachments, the attachments should be processed in order directly behind the email to the extent reasonably practicable. Each document shall be produced with the production number for the first and last page of that document in the "BegBates" and "EndBates" fields of the data load file and with the "BegAttach" and "EndAttach" fields listing the production number for the first and last page in the document family.

(k) Proprietary or Third-Party Software:

To the extent that information produced pursuant to this Protocol cannot be rendered or viewed without the use of proprietary or third-party software, the Parties agree to meet and confer to minimize any expense or burden associated with the production of such information in an acceptable format.

(l) Structured Data:

To the extent a response to discovery requires production of discoverable ESI contained in a structured database, the Producing Party shall produce such information in a reasonably usable and exportable electronic file. The Receiving Party may make reasonable requests for additional

information to explain the database schema, codes, abbreviations, and different report formats, which the Producing Party must consider in good faith.

(m) Production Media:

The Parties shall produce documents via an encrypted Secure File Transfer Protocol ("SFTP") or an encrypted readily accessible electronic media (i.e., an encrypted hard drive) or the Parties agree on an alternate method of transmission that provides similar security for the data and documents included in the production(s). The produced documents shall be password protected and/or encrypted and the Producing Party shall provide the password(s) necessary to access the produced documents under separate cover.

(n) Bates Numbering:

Bates numbering shall be consistent across the production, contain no special characters, and be numerically sequential within a given document. If a Bates number or set of Bates numbers is skipped, the skipped number or set of numbers should be noted with a placeholder page. Attachments to documents will be assigned Bates numbers that directly follow the Bates numbers on the documents to which they were attached. In addition, wherever possible, each *.tiff image will have its assigned Bates number electronically "burned" onto the image.

(o) Message, Chat and Collaboration Software:

If a Party determines that messages from message-based applications are responsive, the entire 24-hour period for the day in which the responsive message was sent will be produced along with any relevant metadata. If there are attachments, those should be produced along with the message following the parent-child relationship described in Paragraph 5(i).

(p) Embedded Files:

Substantive embedded object and/or files (*e.g.,* Excel spreadsheets, Word documents, audio and video files, etc. within a Word processing document), shall be extracted, searched and

produced consistent with other ESI as family groups. Embedded files should be assigned Bates numbers that directly follow the Bates numbers on the documents within which they are embedded. The Parties agree that certain embedded documents, such as non-substantive images and logos embedded in emails (*e.g.,* MS Office embedded images, email in-line images, embedded logos, signatures, OLE objects, images or pictures, and systems and/or container files (e.g., OLE2, .bin, and similar files that hold embedded files but which do not contain user data) shall not be extracted during processing of files.

(q) Linked Documents:

Linked files or "modern attachments" (i.e., hyperlinks pointing to files stored in the cloud or a shared repository such as SharePoint, Google Workspace and other types of collaborative data sources, instead of being directly attached to a message as has been historically common with email communications) are not child documents in the traditional sense, both because the data resides in a different location than the document linking to it, and because that may have been modified since the document linking to it was created or sent. Where facilitated by the email system provider the Parties shall use available technology to collect, search and produce non-public documents attached via hyperlink technology with the email or parent document to which the documents were attached. Hyperlinked documents in emails shall, as feasible, be processed and searched in the same manner as embedded (conventional) attachments for the purposes of preserving a family relationship for production. There is no obligation for a Party to obtain copies of hyperlinked documents that are within the possession, custody and/or control of third parties. If after production, a Receiving Party believes particular embedded file(s) and/or modern attachment(s) are responsive, non-privileged and are not duplicative of any other source, the Parties shall meet and confer to assess collection of the identified embedded file(s) and/or modern attachment(s), including assessing burden and cost, and, if applicable, production format.

**6. PRIVILEGE**

(a) Privilege Logs:

(b) The Parties recognize that some documents may be redacted or withheld on the grounds of attorney-client privilege, work-product doctrine, common interest/ joint defense, or other recognized protections from disclosure (collectively, "privilege"). The Parties agree that documents within responsive families withheld due to privilege should be replaced with a slipsheet that says "Document Withheld for Privilege" such that the production remains family complete. Complete families of documents withheld entirely for privilege shall not be slip-sheeted.

(c) For documents withheld from production pursuant to a claim of attorney-client privilege, work product protection, or other applicable privilege or immunity, the Producing Party shall produce one or more privilege logs in both PDF and Excel format. The designating Party shall produce a privilege log within 60 days following the production of documents from which the privileged documents are withheld. Such privilege log(s) will comply with Fed. R. Civ. Proc. 26(b)(5).

(d) Privilege logs will include the privilege claimed, a description of the nature of the document that, without revealing information itself privileged or protected, will enable other parties to assess the privilege claim and designated objective metadata fields, to the extent they contain information and the information and is not privileged or protected. To the extent the designated objective metadata fields contain privileged or protected information, such information may be redacted from the logs (and within the production) as long as such redactions are labeled on the log as [REDACTED]. Designated objective metadata fields are: Author, From, To, CC, BCC, Date, Email Subject, File Name, and File Extension, Beginning Bates Numbers/Privilege Identifier, Unique Family

Identifier, All Custodians, All Participants (using Relativity's Name Normalization operation), Custodian, Date Created, Date Last Modified, All File Path. Legal personnel shall be identified as such by adding a carat (^) before or after their names in the privilege log, and a list of counsel and their affiliation (including titles for in-house counsel) shall be produced in conjunction with the privilege log

(e) When there is a document comprised of a chain of privileged emails among the same participants and discussing the same subject matter, the Producing Party need only include one entry on the privilege log. A Party shall not be required to separately log individual emails that appear within a single withheld document (e.g., a single email within a withheld document reflecting an email string). In the case of an entry log involving a chain of privileged emails, the Receiving Party is allowed to make reasonable requests of the Producing Party to provide logs for more specific emails within the thread if there is a need for de-threading the emails for purposes of assessing the privilege claims.

(f) <u>Exclusions from Logging</u>:

The following categories of documents do not need to be contained on a Producing Party's privilege log, unless good cause exists to requires that a Party do so.

(i) Any communications exclusively between a Producing Party and its outside counsel, an agent of counsel other than the Party, any non-testifying experts in connection with this specific litigation, or, with respect to information protected by Fed. R. Civ. P. 26(b)(4), testifying experts in connection with this specific litigation, created on or after the date of the Complaint.

(ii) Any privileged materials or work product created by or specifically at the direction of a Party's counsel, an agent of counsel other than the Party, any non-testifying experts in connection with this specific litigation, or, with respect to information protected by Fed. R. Civ. P. 26 (b)(4), testifying experts in connection with this specific litigation, created on or after the date of the Complaint.

(iii) For avoidance of doubt communications or documents between Producing Party and Mandiant, Inc., Palo Alto Networks, Inc., Coveware, Inc.,

> PricewaterhouseCoopers Advisory Services LLC, FTI Consulting (except where the communication/work is entirely related to its role in this litigation as a testifying expert), Dell Technologies, Crowdstrike, and any other cybersecurity experts must still be logged.

(g) Privilege Clawback Process:

Upon the discovery by the Producing Party that Privileged Material was produced in this Action, whether inadvertent or otherwise, the Producing Party shall, within 20 days after such discovery, notify the Receiving Party in writing that the Producing Party is requesting the return of Privileged Material (the "Clawback Notice"). Such Clawback Notice should identify the Privileged Material by Bates number. Upon receipt of the Clawback Notice, the Receiving Party may not further review the material at issue.

Should the Receiving Party discover that Privileged Material has been produced in this Action, the Receiving Party shall, within 20 days after such discovery, notify the Producing Party of the existence of such Privileged Material and request that the Producing Party confirm in writing whether it requests that such material should be returned.

Upon receiving written notice from the Producing Party that privileged and/or work product material has been produced and should be returned/destroyed, the Receiving Party shall return/destroy all Privileged Material identified in such written notice, and all copies thereof, to the Producing Party within five (5) business days of receipt of such notice. The Receiving Party shall also attempt, in good faith, to retrieve and return or destroy all copies of the Identified Materials in electronic format. The Receiving Party may make no use of the Privileged Material during any aspect of this matter or any other matter, including in depositions or at trial, unless the Producing Party waives any protection in writing or the Privileged Material is later determined by a court to not be privileged or otherwise protected from disclosure.

The Producing Party will, within 20 days after providing notice requesting the return of

Privileged Material, provide a privilege log providing information required by Rule 26(b)(5) of the Federal Rules of Civil Procedure and applicable case law to the Receiving Party, in accordance with the logging requirements of Section 6.

(h) Privilege Challenges to Clawed Back Documents:

The Parties agree that the mere fact that a document was produced in this Action does not waive any applicable privilege or protection.

If the Receiving Party intends to challenge the assertion of privilege or work product protection with respect to a specific document under this provision, the Receiving Party must notify the Producing Party within 20 days of receiving written notice of its privileged status of the Receiving Party's grounds for the challenge. The Parties agree to meet and confer concerning any such dispute. Should the Parties fail to resolve the dispute, the Receiving Party must within 20 days of the meet and confer move the Court for a determination regarding whether the specific document in question is privileged. Nothing in this Order shall prevent the Producing Party from seeking a Protective Order or utilizing any other appropriate mechanism to obtain a privilege determination from the Court.

The Receiving Party may not use the Produced Privileged Information for any purpose until the dispute is resolved.

Notwithstanding the foregoing, the Parties agree that any document used by any Party in a deposition, expert report, or court filing in this Action that a Producing Party does not clawback within fourteen calendar days (thirty calendar days for expert reports) of its use ("Used Document") shall not be eligible for clawback. Such ineligibility for clawback of that document shall not result in a subject matter waiver in any other state or federal proceeding.

## 7. DISPUTES

If any disputes arise, the Parties shall meet and confer in a good faith effort to reach a

mutually agreeable solution. If they cannot agree, the matter may be brought to the Court in accordance with the Court's procedure for discovery disputes.

## 8. MODIFICATION

Variations from this ESI Protocol may be required. Any practice or procedure set forth herein may be varied by agreement by the Parties, which will be confirmed in writing. The Parties agree that in the event that they cannot agree to a specific modification, any affected Party may request the Court's assistance to resolve such dispute.

Date: May 27, 2026

**SO ORDERED:** John A. Ross

# APPENDIX A: TECHNICAL SPECIFICATIONS AND REQUIRED METADATA FIELDS

**1. IMAGES:**

- Produce documents as single page, black and white, Group IV, 1-bit TIFF files.
- Image Resolution 300 DPI.
- File Naming Convention: Match Bates Number of the page.
- Insert placeholder image for files produced in Native Format, Privilege Withhold slipsheet, or Technical Issue slipsheet.
- Original document orientation shall be retained.
- Images shall reveal comments, notes, track changes, speaker notes, and the like.

**2. SPECIAL FILE TYPE INSTRUCTIONS:**

- Responsive, unredacted Microsoft Excel and other spreadsheet files, and designated PowerPoint/Keynote and other presentation files, audio/video files, and animation files as agreed to by the Parties in section 5(e)(iii) and 5(f), shall be produced in Native Format.
- The Producing Party will produce a placeholder (a single-page TIFF slip sheet indicating that the native item was produced) along with the file itself in Native Format.
- The placeholder will be branded with the production number in the lower right-hand corner and the phrase "PRODUCED IN NATIVE ONLY" branded in the center of the page. The Producing Party will also brand any confidentiality or similar endorsements in the lower left-hand corner of the placeholder.

**3. FULL TEXT EXTRACTION/OCR:**

- Produce full extracted text for all file types (Redacted text will not be produced) including text of embedded content unless file is a Technical Issue slipsheet document or Privilege Withhold slipsheet document.
- Produce OCR text for any paper document.
- Produce OCR text for any ESI where the source format was an image file (such as JPG, JPEG, GIF, BMP, PCX, PNG, TIF, TIFF etc.) where extracted text cannot be provided, using industry standard OCR technology (Redacted text will not be produced).
- Produce OCR text for any redacted document.

- Production format: Single text file for each document, not one text file per page.
- File Naming Convention: Match BegBates Number.

**4. LOAD FILES**

Data Load File: The data load file should use standard Concordance delimiters:

- Comma - ¶ (ASCII 20)
- Quote - þ (ASCII 254)
- Newline-® (ASCII174)

- The first record should contain the field names in the order of the data;
- All date fields should be produced in mm/dd/yyyy format;
- Use carriage-return line-feed to indicate the start of the next record;
- Load files should not span across media (e.g., CDs, DVDs, Hard Drives, Etc.); a separate volume should be created for each piece of media delivered;
- The name of the data load file should mirror the name of the delivery volume, and should have a .DAT extension (i.e., ABC00l.DAT);
- The volume names should be consecutive (i.e., ABC00l, ABC002, et. seq.)

**5. IMAGE LOAD FILE**

- The name of the image load file should mirror the name of the delivery volume, and should have an .OPT extension (i.e., ABC001.0PT).
- The volume names should be consecutive (i.e., ABC001, ABC002, et. seq.).
- There should be one row in the Load File per TIFF image.
- Every image in the delivery volume should be contained in the image load file.
- The image key should be named the same as Bates Number of the page.
- Load files should not span across media (e.g., CDs, DVDs, Hard Drives, Etc.), i.e., a separate volume should be created for each piece of media delivered.
- The Opticon OPT image load file (.OPT) configuration shall be a page level comma delimited file containing seven fields per line: PageID, VolumeLabel, ImageFilePath, DocumentBreak, FolderBreak, BoxBreak, PageCount.

**METADATA FIELDS**

| Field | Description | Email | Non-Email ESI | Hard Copy |
|---|---|---|---|---|
| Production Number Begin | Beginning page production number | x | x | x |
| Production Number End | Ending page production number | x | x | x |
| Attachment Begin | Beginning page of attachment range | x | x | x |
| Attachment End | Ending page of attachment range | x | x | x |
| Attachment Count | Number of attachments | x | x | |
| Custodian | Name of the custodian or repository name of the document produced - Last Name, First Name format | x | x | x |
| All Custodians | Name(s) of the deduplicated custodians or repository name(s) of the document produced - Last Name, First Name format; semi-colon delimited | x | x | |

| | | | | |
|---|---|---|---|---|
| File Name | File name of document | x | x | |
| File Extension | File extension of document | x | x | |
| Email Outlook Type | Type of Outlook item, e.g. email, calendar item, note, task | x | | |
| Page Count | For documents produced in TIFF form, number of pages in the document. For documents produced in native or as a placeholder image slipsheet, page count will be 1 (for placeholder). | x | x | x |
| Document Title | Title field extracted from the Metadata of a non-email document | | x | |
| Author | Document author of a non-email document | | x | |
| Email Subject | Subject of email | x | | |
| From | Email author | x | | |
| To | Email recipients | x | | |
| CC | Email copyees | x | | |
| BCC | Email blind copyees | x | | |
| Date-Time Sent | Date sent (mm/dd/yyyy hh:mm:ss format) | x | | |

| | | | | |
|---|---|---|---|---|
| Date-Time Received | Date received (mm/dd/yyyy hh:mm:ss format) | x | | |
| Date-Time Created | Creation date (mm/dd/yyyy hh:mm:ss format) | x | x | |
| Date-Time Last Modified | Last modification date (mm/dd/yyyy hh:mm:ss format) | x | x | |
| Hash Value | Unique electronic signature of email or electronic file used for deduplication. | x | x | |
| Message-ID | The Outlook Message ID assigned by the Outlook mail server, if applicable. | x | | |
| Production Volume | Production volume name | x | x | x |
| Confidentiality | Confidentiality designation pursuant to the Protective Order | x | x | x |
| Redacted | Descriptor for documents that have been redacted (<yes> or <no>) | x | x | x |
| Native Link | Path to produced native file used for linking. | x | x | x |

| | | | | |
|---|---|---|---|---|
| Extracted Text Link | Path to produced extracted text file used for database linking. | x | x | x |
| AllFilePath | Descriptor for file's original location and folder structure. | x | x | |